Joseph Rebein (Admitted *Pro Hac Vice*)
Andrew Carpenter (Admitted *Pro Hac Vice*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
Telephone: 816-474-6550
Facsimile: 816-421-5547
jrebein@shb.com
acarpenter@shb.com

Tammy B. Webb, SBN 227593
John K. Sherk, SBN 295838
SHOOK, HARDY & BACON L.L.P.
One Montgomery, Suite 2700
San Francisco, California 94104
Telephone: 415-544-1900
Facsimile: 415-391-0281
tbwebb@shb.com
jsherk@shb.com

*Attorneys for Defendant*
Union Pacific Railroad Company

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

In re SFPP Rights-of-Way Claims

CASE NO. 8:15-cv-00718-JVS-DFM

**DEFENDANT UNION PACIFIC'S SUPPLEMENTAL BRIEFING ON DISCOVERY DISPUTE**

Defendant Union Pacific Railroad Company submits this supplemental briefing regarding a dispute over Plaintiffs' Requests for Production Nos. 9 and 28. These requests are not proportional to the needs of this case, and responding to them would be extraordinarily burdensome. *See* FED. R. CIV. P. 26(b)(1). Union Pacific respectfully requests that this Court sustain Union Pacific's objections to request Nos. 9 and 28. Alternatively, if this Court requires that Union Pacific respond to the requests, Union Pacific respectfully requests that Plaintiffs be ordered to pay for the costs of production.

## INTRODUCTION

This Court has asked the parties for additional briefing about the Rule 26 proportionality factors that bear on the parties' discovery dispute. As addressed at the informal telephonic hearing, Union Pacific has doubts about the relevance of the discovery demanded here. But even if the requested discovery has some relevance to the claims and defenses in this case, the cost and burden to Union Pacific far outweigh any potential benefit. This brief will therefore focus on the burden these requests present to Union Pacific.

Plaintiffs' discovery would require that Union Pacific pore over thousands of pages of documents relating to the business activities of two companies going back over half a century. As such, Union Pacific will begin by providing the Court with a historical background that will frame the dispute and provide a context for Union Pacific's objections.

## HISTORICAL BACKGROUND

The relationship between Union Pacific (occasionally the "Railroad") and Kinder Morgan (occasionally the "Pipeline") and their respective predecessors can be traced back the mid-1950s. At that time, the Railroad and the Pipeline were sister subsidiaries of the Southern Pacific holding company, which owned the Southern Pacific railroad. In 1955, the Railroad began granting easements to the Pipeline to install pipelines under the Railroad's operating right of way to convey petroleum products across California and other western states. The Railroad and the Pipeline remained sister companies for more than 30 years.

In the late 1980s, the relationship between the Railroad and the Pipeline changed significantly. The parent company of the Railroad and the Pipeline announced a proposed merger with Santa Fe Industries, Inc. ("Santa Fe"). Santa Fe's acquisition of the Southern Pacific railroad was subject to federal regulatory approval, but the acquisition of the Pipeline was not. As a result, the Pipeline was immediately

acquired by Santa Fe. Regulators, however, ultimately disapproved the merger and the Railroad was sold to a third party. Soon after, litigation between the Pipeline and the Railroad began, including over the amount of rent the Pipeline should pay for the pipeline easements. Decades of litigation followed.

Disputes notwithstanding, the business relationship between the Railroad and the Pipeline has continued over six decades. Over this time, the Railroad and the Pipeline have worked together regularly on engineering projects, real estate transactions, accounting matters, fuel transportation logistics, environmental issues, and the coordination of third-party shipments. These business dealings have resulted in the creation of hundreds of thousands of documents, the bulk of which would be in paper form given the time period in which they were created.

In 1997, federal regulators approved a merger involving the railroads controlled by Union Pacific's parent and the parent corporation of the Southern Pacific railroad. After that transaction, the Southern Pacific railroad's documents were gathered, boxed, and sent to Union Pacific. The bulk of Southern Pacific railroad's documents were shipped to Union Pacific's headquarters in Omaha, Nebraska, while other documents were transferred to Union Pacific's field offices or storage facilities in other states.

Thousands of boxes of Southern Pacific railroad documents arrived in Omaha from 1998-2002. When the Union Pacific contractors labeled the boxes and created each box's index, they essentially relied on the descriptions provided by Southern Pacific. The document indices are incomplete and sometimes inaccurate.

Some of Southern Pacific railroad's documents have been scanned and placed in Union Pacific's databases.[1] The majority of these documents, however, are in paper form. While some paper documents are stored in Union Pacific's headquarters

---

[1] The bulk of the scanned Southern Pacific railroad documents are executed agreements.

in Omaha, the bulk of the documents are housed in storage facilities in Omaha or other cities. There are two storage facilities in Omaha, one is Iron Mountain and the other is Airlite. The Iron Mountain facility in Omaha contains over 70,900 boxes of Union Pacific documents. The quality of the Iron Mountain document indices varies; some file descriptions are robust while others are literally non-existent. Union Pacific also maintains files in eight other Iron Mountain locations in the West and Midwest, which store over 19,200 boxes of Union Pacific documents. Based on the available indices, there could be responsive documents in each of these other Iron Mountain facilities.

The Airlite warehouse encompasses an entire city block in Omaha and contains only documents from Union Pacific. There are approximately 8,261 boxes of documents at Airlite. Identification of the materials in the boxes at Airlite is hampered by the lack of accuracy and the inconsistency of the indices.[2]

## THE 2004 RENT TRIAL AND UNION PACIFIC'S PRODUCTION

Union Pacific is producing a voluminous number of documents and other materials from the 2004 Rent trial in response to Plaintiffs' 40 document requests. As such, an overview of the trial is warranted.

The Rent trial began in 2007, and encompassed roughly 250 trial days. The underlying discovery effort by both parties was extensive. Union Pacific and Kinder Morgan deposed approximately 25 witnesses, including eight experts. Union Pacific produced 13 fact and corporate representative witnesses, whose testimony encompassed 20 days. Union Pacific's three expert witnesses were deposed over 20 days.

---

[2] Union Pacific also maintains off-site underground storage at the salt mines facility in Hutchinson, Kansas. While this storage facility should contain files from a different railroad, which became part of the Union Pacific system in the early 1980s, based on the available index descriptions, at least one box in that facility may contain potentially responsive documents to Plaintiffs' requests.

Producing the 2004 Rent trial materials is itself a burdensome and expensive enterprise. These materials include the trial exhibits that were admitted in the case; Union Pacific employee and Person Most Knowledgeable deposition transcripts and exhibits; and Union Pacific's experts' depositions and exhibits. Additionally, Union Pacific has agreed to produce discovery materials generated in the Rent trial, including the bulk of its 2004 Rent Case document productions.

In total, Union Pacific estimates its production count for 2004 Rent trial materials will be upwards of 440,000 pages. *See* Affidavit of Colleen Graham ("Graham Aff.") at ¶ 11. The production of the Rent materials will cost approximately $63,000 and require 30 hours of work by Union Pacific personnel. (Graham Aff. at ¶ 11).

Union Pacific respectfully suggests that Plaintiffs first review the materials that are being produced before insisting that Union Pacific search through thousands of boxes of documents to find the "negotiations" and "communications" between Union Pacific and Kinder Morgan.

## ARGUMENT

### I. REQUEST NO. 9:

Request No. 9 seeks documents reflecting negotiations between the predecessors of Union Pacific and Kinder Morgan. Plaintiffs begin by identifying five specific agreements: (1) the 1955 and (2) 1956 master agreements; (3) the 1983 master agreement; (4) the 1994 settlement agreement; and (5) the 1994 AREA agreement.

First, Plaintiffs want Union Pacific to search for documents that reflect negotiations that would have taken place as long as *60 years ago*. The temporal sweep of this request alone makes it objectionable. Second, searching for documents reflecting negotiations presents a tremendous burden for Union Pacific. *See Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010) ("Rule

26(b), although broad, has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition."); *see also* SUP. CT. OF THE U.S., 2015 YEAR-END REPORT ON THE FEDERAL JUDICIARY 7 (2015), http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf ("[T]he pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery. The key here is careful and realistic assessment of actual need."). Union Pacific can locate the signed agreements: *it has already produced those documents*. But with broad terms like "negotiations," the searching process expands appreciably and locating responsive documents is problematic.

That is especially true here. Union Pacific is not the entity that was involved in the negotiations of these agreements. There is no file room at Union Pacific's headquarters that holds boxes of documents labeled "negotiations with the pipeline company." Instead, Union Pacific would have to search through hundreds of boxes of paper documents it received from Southern Pacific railroad in the slim hope of finding something responsive. And the Southern Pacific railroad documents are not pristinely organized and catalogued.

The bottom line is that Union Pacific had no control over the organization or maintenance of the Southern Pacific railroad documents until they arrived in Omaha after the merger transaction. And even then, Union Pacific was saddled with the often inaccurate or incomplete descriptions of what the boxes actually contained.

The situation is made even worse by the fact that documents conceivably touching on negotiations could be in different storage facilities in different locations. The documents could be in the Airlite warehouse, the Iron Mountain facility in Omaha, or they could be in an Iron Mountain facility in Texas, California, Oregon, Missouri, Utah or Colorado. And even with Union Pacific's index of boxes, due to

DEFENDANT'S SUPPLEMENTAL BRIEFING
CASE NO. 8:15-cv-00718-JVS-DFM

990500 v6

the often missing or inaccurate labeling of the boxes and files, there is no way to avoid a box-by-box review.

Plaintiffs' desire to find a needle in a haystack cannot justify the burden that this Request foists on Union Pacific. *See*, *e.g.*, *Cabasug v. Crane Co.*, No. CV-12-00313 JMS-BMK, 2013 WL 4679130, at *3 (D. Haw. Aug. 30, 2013) (concluding that a discovery request that would have required a corporate defendant to search through 5,600 boxes in a document repository was unduly burdensome and thus impermissible because the defendant had already produced the most relevant documents in the depository).

Request No. 9 also asks that Union Pacific produce documents reflecting negotiations concerning "all lease agreements" and "other agreements concerning any other matter regarding the Pipeline or the Line." These requests are far broader than the ones discussed above, and give rise to the same objections and concerns.

But these requests also implicate the long-standing business relationship between the Railroad and the Pipeline. For example, searching for documents that reflect negotiations for "all lease agreements" wraps in the 60-plus year relationship between the parties. There have been literally thousands of lease agreements negotiated over the decades. Locating documents reflecting the *negotiations* of these agreements in countless boxes of documents in various storage facilities would place an enormous and disproportionate burden on Union Pacific.

Similarly, when Plaintiffs request "all other agreements concerning any other matter" regarding the pipeline or the right-of-way, they ignore the multi-faceted business relationship that has existed between the companies for more than half a century. For example, the request would include documents concerning negotiations for railroad crossings, engineering projects, pipeline relocations, the clean-up of environmental incidents, and the transportation of fuel, just to name a few.

## II. REQUEST NO. 28:

In request No. 28, Plaintiffs seek "all communications" between the Railroad and the Pipeline concerning the value of the pipeline or the right-of-way. This request compels all the same objections that were made to request No. 9, but there are unique aspects to No. 28 that render this request objectionable.

To begin with, "communications" is an extraordinarily broad term. It is one thing to search for an "agreement," but it is virtually impossible to craft a targeted search for "communications." *See Miller v. York Risk Servs. Grp.*, No. 2:13-CV-1419 JWS, 2015 WL 3490031, at *4 (D. Ariz. June 3, 2015) (denying motion to compel production of email communications about claims adjusters' performance because defendant had already produced actual performance reviews). This request could conceivably include every letter, memorandum, report, appraisal, opinion, work paper, email, fax, or telegram created by the Railroad or the Pipeline in the last 60 years that in any way touches upon the value of the pipeline or the right-of-way. It would take a Herculean effort to slog through thousands of boxes to unearth the documents which fit this expansive request.

It is somewhat curious that Plaintiffs are making a demand for "communications" regarding valuation, because they have propounded a number of similar requests to Union Pacific requesting the same type of "value" documents, as indicated by the chart below:

| Request | Subject Requested |
|---|---|
| RFP No. 20 | Appraisals concerning the value of the Line |
| RFP No. 21 | Appraisals concerning the value of the Pipeline |
| RFP No. 22 | Expert reports concerning the value of the Line |
| RFP No. 23 | Expert reports concerning the value of the Pipeline |
| RFP No. 27 | Identifying expert witnesses concerning or impacting valuation of the Pipeline or valuation of the Line |
| RFP No. 29 | Documents created by Pipeline Defendants concerning value of the Pipeline or value of the Line |
| RFP No. 30 | Documents created by the Railroad Defendant concerning value of the Pipeline or value of the Line |

Union Pacific and Plaintiffs have reached agreement as to requests 20, 21, 22, 23, 27, 29, and 30 – which is concrete proof that Union Pacific is not taking its discovery obligations lightly. Union Pacific respectfully requests that its objection to request No. 28 be sustained.

### III. IF THIS COURT ORDERS UNION PACIFIC TO RESPOND TO THESE REQUESTS, COST-SHIFTING WOULD BE APPROPRIATE.

If this Court orders Union Pacific to respond to Plaintiffs' Requests 9 and 28, Union Pacific requests that all or some of the costs of production to be shifted to the Plaintiffs. Rule 26(c) authorizes a court to "issue an order to protect a party . . . from . . . undue burden or expense, including . . . the allocation of expenses, for the disclosure or discovery." FED. R. CIV. P. 26(c); *see also U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 240 (S.D. Cal. 2015).

Union Pacific's production of the 2004 Rent trial materials represents a massive commitment of time, resources and manpower. As mentioned above, Union Pacific has already expended $41,000 on the Rent trial production, and total costs are expected to be $63,000. (Graham Aff. at ¶ 11). Plaintiffs' demand must be viewed against the backdrop of what Union Pacific is already producing. *See generally Schweinfurth v. Motorola, Inc.*, No. 1:05CV0024, 2008 WL 4449081, at *2 (N.D. Ohio Sept. 30, 2008) (court ordered that the costs of a document production be split 50/50 because of "the sheer size of the discovery already produced—i.e. over 200,000 pages of documents—and the immense size of the discovery now ordered to be produced—i.e. allegedly over 1,000,000 pages."); *see also Boeynaems v. LA Fitness Int'l, LLC*, 285 F.R.D. 331, 341 (E.D. Pa. 2012) ("where (1) class certification is pending, and (2) the plaintiffs have asked for very extensive discovery, compliance with which will be very expensive, that absent compelling equitable circumstances to the contrary, the plaintiffs should pay for the discovery they seek.").

Indeed, the factors that animate a request for cost-shifting weigh in favor of Union Pacific. For example, Requests 9 and 23 are not "narrowly-tailored" to discover relevant information; indeed, it is hard to imagine how their "negotiations" and "communications" requests could be much broader. *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 322 (S.D.N.Y. 2003) (articulating cost-shifting factors). Moreover, the documents they seek may very well come from "another source" – the ongoing Rent production. *Id.* Finally, whatever benefits the responsive documents might provide pale in comparison to the burdens of the effort. *Id.*; *see also OpenTV v. Liberate Techs.*, 219 F.R.D. 474, 479 (N.D. Cal. 2003) (*Zubulake* factors applied); *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 413 (N.D. Ill. 2007) (ordering 50/50 cost shifting for production of 19,000 boxes of paper documents); *Foreclosure Mgmt. Co. v. Asset Mgmt. Holdings, LLC*, No. CIV.A. 07-2388-DJW, 2008 WL 3822773, at *7 (D. Kan. Aug. 13, 2008) (ordering 50/50 cost shifting for production of paper documents where review would have taken 2,000 hours).

Union Pacific estimates that to identify, review, and produce the documents requested in Nos. 9 and 28 will cost at least $1,700,000. (Graham Aff. at ¶ 19). This estimate includes the cost of hiring personnel from a temporary agency to complete the identification, retrieval and review process, and the cost of scanning, hosting and producing responsive documents. (*Id.* at ¶ 17). This amount is in addition to the hours that Union Pacific personnel would incur to undertake this process, including attorney time to evaluate responsive documents for privilege. (*Id.* at ¶ 18).

## **CONCLUSION**

Because Plaintiffs' requests 9 and 28 are not proportional to the needs of this case, Union Pacific requests that its objections be sustained. Alternatively, if this Court orders Union Pacific to respond to the Requests, Union Pacific requests that Plaintiffs be ordered to pay for the costs of production.

| | | |
|---|---|---|
| 1 | Dated: July 12, 2016 | Respectfully submitted, |
| 2 | | |
| 3 | | /s/ John Sherk<br>Joseph Rebein (Admitted *Pro Hac Vice*) |
| 4 | | Andrew Carpenter (Admitted *Pro Hac Vice*)<br>SHOOK, HARDY & BACON L.L.P. |
| 5 | | 2555 Grand Boulevard<br>Kansas City, Missouri 64108 |
| 6 | | Telephone: 816-474-6550<br>Facsimile: 816-421-5547 |
| 7 | | jrebein@shb.com<br>acarpenter@shb.com |
| 8 | | Tammy B. Webb, SBN 227593 |
| 9 | | John K. Sherk III, SBN 295838<br>SHOOK, HARDY & BACON L.L.P. |
| 10 | | One Montgomery, Suite 2700<br>San Francisco, California 94104 |
| 11 | | Telephone: 415-544-1900<br>Facsimile: 415-391-0281 |
| 12 | | jsherk@shb.com<br>tbwebb@shb.com |
| 13 | | Attorneys for Defendant |
| 14 | | Union Pacific Railroad Company |