**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARIA J. BARAHONA; COACHELLA SELF STORAGE, LLC; MARY CRUZ; MONICA RODRIGUEZ ELPIDIO; KENNETH R. HANSEN; ALAN WILLSMORE, as Trustee for the Wilmore Trust; SHELLEY WILLSMORE, as Trustee for the Wilmore Trust; ENRIQUE MOLINA; JAMES PILCHER; SUSAN PILCHER; RICHARD BAGDASARIAN, INC.; EVERARDO RIVERA; LIDIA RIVERA; CONNIE SANCHEZ; DAVID SANCHEZ; CHARLES SERRANO; BARBARA SLOAN; RAVINDER S. THIARA; SUREENA THIARA, | No. 16-56562 |
| | D.C. No. 8:15-cv-00718-JVS-DFM |
| *Plaintiffs*, | |
| | OPINION |
| and | |
| MARTIN WELLS, as trustee of the MARTIN & SUSAN WELLS REVOCABLE TRUST; SUSAN WELLS, as trustee of the MARTIN & SUSAN WELLS REVOCABLE TRUST; SANDRA L. HINSHAW, | |
| *Plaintiffs-Appellees*, | |
| v. | |

2          WELLS V. UNION PAC. R.R. CO.

UNION PACIFIC RAILROAD
COMPANY, successor to SOUTHERN
PACIFIC TRANSPORTATION
COMPANY,

              *Defendant-Appellant*,

      and

SFPP, L.P.; KINDER MORGAN
OPERATING L.P. "D"; KINDER
MORGAN G.P., INC.,

              *Defendants.*

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted December 7, 2017
Pasadena, California

Filed February 6, 2018

Before: Stephen Reinhardt and Jacqueline H. Nguyen,
Circuit Judges, and Frederic Block, District Judge.[*]

Opinion by Judge Block

---

[*] The Honorable Frederic Block, Senior United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Railroads / Rights of Way

The panel reversed the district court's order granting a motion to dismiss Union Pacific Railroad's counterclaims in class action suits brought by landowners challenging Union Pacific's ability to lease land under 1,800 miles of its right of way to Santa Fe Pacific Pipeline, L.P., which uses the land for a petroleum pipeline.

Congress granted railroads various rights of way under "pre-1871 Acts" and the General Railroad Right-of-Way Act of 1875.

The district court held that (1) the acts of Congress conferring the right of way authorized Union Pacific to use the right of way only for a "railroad purpose," and (2) the pipeline did not serve such a purpose. The district court certified those issues for interlocutory review under 28 U.S.C. § 1292(b).

The panel rejected the appellees' contention that this court should not reach the merits of the certified questions, but instead should give preclusive effect to the California Court of Appeal's decision in *Union Pac. R.R. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134, 155 (2014), under the doctrine of collateral estoppel.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the pre-1871 Acts do not require a "railroad purpose." Specifically, the panel held that while the *Union Pacific* decision modified the holding in *Northern Pacific Railway v. Townsend*, 190 U.S. 267 (1903), to stand only for the proposition that the railroads obtained at least the rights necessary to carry out railroad purposes under the pre-1871 Acts, it did not go further and hold that "railroad purposes" actually defined the outer limits of the grants. The panel also held that the pre-1871 Acts conferred a fee simple defeasible in everything except the mineral estate; and that interest entitled Union Pacific to lease the subsurface as well as the surface of its right of way to Santa Fe Pipeline as long as it continued to use the right of way to operate a railroad, regardless of whether the pipeline itself served a "railroad purpose."

Concerning whether the pipeline served a railroad purpose under the 1875 Act, the panel held that Union Pacific plausibly alleged that the benefit it derived from the pipeline was sufficient for the "incidental-use doctrine" (providing that railroad rights of way confer all rights incident to a use for railroad purposes) to apply. The panel further held that the district court should have granted Union Pacific leave to amend to add facts supporting the contention that the pipeline served a railroad purpose; and remanded with instructions to grant leave to amend.

## COUNSEL

J. Scott Ballenger (argued), Melissa Arbus Sherry, and Alexandra P. Shechtel, Latham & Watkins LLP, Washington, D.C.; Joseph Rebein, Shook Hardy & Bacon LLP, Kansas City, Missouri; Tammy B. Webb and John K. Sherk III,

Shook Hardy & Bacon LLP, San Francisco, California; for Defendant-Appellant.

Barrett J. Vahle (argued) and Norman E. Siegel, Stueve Siegel Hanson LLP, Kansas City, Missouri; Thomas S. Stewart, Stewart Wald & McCulley LLC, Kansas City, Missouri; for Plaintiffs-Appellees.

Katherine J. Barton and Matthew Littleton, Attorneys; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States.

Eric S. Boorstin and Jeremy B. Rosen, Horvitz & Levy LLP, Burbank, California; Sheldon Gilbert and Kate Comerford Todd, U.S. Chamber Litigation Center Inc., Washington, D.C.; for Amicus Curiae Chamber of Commerce.

## OPINION

BLOCK, District Judge:

For more than half a century, the Union Pacific Railroad ("Union Pacific") has leased land under 1,800 miles of its right of way to Santa Fe Pacific Pipelines, L.P. ("SFPP"), which uses the land for a petroleum pipeline.  In a suit by landowners challenging Union Pacific's ability to lease the land, the district court held that (1) the acts of Congress conferring the right of way authorized Union Pacific to use the right of way only for a "railroad purpose," and (2) the pipeline did not serve such a purpose.  It then certified those

6              WELLS V. UNION PAC. R.R. CO.

issues for interlocutory review pursuant to 28 U.S.C.
§ 1292(b).  We granted permission to appeal and, for the
following reasons, disagree with the district court's
conclusions.

I

A.  Historical Background

In the mid-19th century, the vast expanse of territory west
of the Mississippi River "remained a largely untapped
resource," *Leo Sheep Co. v. United States*, 440 U.S. 668, 670
(1979), in part because the nation's long-distance
transportation network could not keep pace with its
expanding frontier.  The railroads bridged that gap.

Enthusiasm for a transcontinental railroad was initially
offset by fierce sectional debate over which route the
railroad should take.  The deadlock was finally broken in
the early 1860s, when seceding states stopped sending
representatives and senators to Congress.  Thus, development
of a transcontinental railroad began in earnest against the
backdrop of the Civil War.  *See id.* at 674 ("Senators and
Representatives from those States which seceded from the
Union were no longer present in Congress, and therefore the
sectional overtones of the dispute as to routes largely
disappeared.").

In 1862, Congress passed, and President Lincoln signed,
"[a]n Act to aid in the Construction of a Railroad and
Telegraph Line from the Missouri River to the Pacific
Ocean."  Act of July 1, 1862, ch. 120, 12 Stat. 489 ("1862
Act").  The 1862 Act chartered Union Pacific's predecessor
and authorized it to build a railroad from the Nebraska

Territory to the western border of the Nevada Territory.  *See id.* § 1, 12 Stat. at 490.  It then authorized the existing Central Pacific Railroad Company of California to build a railroad east from either San Francisco or the Sacramento River and link up with Union Pacific's road on the eastern border of California.  *See id.* § 9, 12 Stat. at 494.[1]  Similar acts authorized construction of the Northern Pacific Railroad from the Great Lakes to Puget Sound, *see* Act of July 2, 1864, ch. 217, 13 Stat. 365; a branch from the Central Pacific's line to Portland, Oregon, *see* Act of July 25, 1866, ch. 242, 14 Stat. 239; the Atlantic and Pacific Railroad from Missouri to the Pacific Ocean, *see* Act of July 27, 1866, ch. 278, 14 Stat. 292; and the Texas Pacific Railroad from Texas to San Diego, *see* Act of Mar. 3, 1871, ch. 122, 16 Stat. 573.

To assuage scruples about its constitutional authority to directly subsidize internal improvements, Congress based these acts—which we refer to as the "pre-1871 Acts"—on its "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV, § 3.  Congress used this power in two ways.  First, it granted the relevant corporation "the right of way through the public

---

[1] Slow going on the westbound road enabled the Central Pacific to extend its road beyond the California border to the eventual meeting point at Promontory Summit, Utah Territory, where Leland Stanford famously drove the golden spike on May 10, 1869.  *See* Act of July 2, 1864, ch. 216, § 16, 13 Stat. 356, 363 (authorizing the Central Pacific to extend its line 150 miles eastward from the California-Nevada border); Act of July 3, 1866, ch. 159, § 2, 14 Stat. 79, 80 (authorizing the Secretary of the Interior to approve further extensions of the Central Pacific line until it met with the Union Pacific line); *Leo Sheep Co.*, 440 U.S. at 677; David Haward Bain, *Empire Express: Building the First Transcontinental Railroad* 178–79, 181–83, 270–71, 661–66 (Penguin Books 2000) (1999).

lands . . . for the construction of [a] railroad and telegraph line." 1862 Act, § 2. With one exception, the grant extended "two hundred feet in width on each side of [the] railroad where it may pass over the public lands," and included "all necessary grounds for stations, buildings, workshops, and depots, machine shops, switches, side tracks, turntables, and water stations." *Id.*[2]

In addition to granting these rights of way, "Congress embarked on a policy of subsidizing railroad construction by lavish grants from the public domain." *Great N. Ry. v. United States*, 315 U.S. 262, 273 (1942). In the 1862 Act, the grant amounted to five alternating sections of public land along every mile of track. *See* 1862 Act, § 3. The resulting checkerboard pattern extended out for ten miles on each side on the track. *See id.* When even that grant proved an insufficient enticement, Congress extended it to twenty miles in both directions. *See* Act of July 2, 1864, § 4, 13 Stat. at 358. There was, however, a proviso in the grant: "[A]ll mineral lands shall be excepted from the operation of this act." 1862 Act, § 3.

The checkerboard grants were controversial from the start and eventually fell out of favor. *See* James W. Ely, Jr., *Railroads and American Law* 58 (2001). Congress made no such grants after 1871, *see id.*, although it continued to grant rights of way over public lands for the tracks of new railroads. That practice was streamlined in the General Railroad Right-of-Way Act of 1875, ch. 152, 18 Stat. 482 ("1875 Act"):

---

[2] The right of way granted to the Central Pacific for its Portland branch was only 100 feet on each side of the road. *See* Act of July 25, 1866, § 3, 14 Stat. at 240.

> [T]he right of way through the public lands of the United States is hereby granted to any railroad company . . . to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

*Id.* § 1, 18 Stat. at 482. To perfect its right of way, a company would file a map describing the path (or proposed path) of its railroad with the local land office; once the map was approved and recorded, any land over which the right of way passed was "subject to such right of way." *Id.* § 4, 18 Stat. at 483.

## B. Legal Background

Inevitably, disputes arose over the nature of the rights acquired under both the pre-1871 Acts and the 1875 Act. In *St. Joseph & Denver City Railroad v. Baldwin*, 103 U.S. 426 (1880), the Supreme Court described the interest conveyed by an act materially identical to the pre-1871 Acts as "a present absolute grant, subject to no conditions except those necessarily implied, such as that the road shall be constructed and used for the purposes designed." *Id.* at 429–30. In *Missouri, Kansas & Texas Railway v. Roberts*, 152 U.S. 114 (1894), it described the interest as a fee: "The title to the land

for the 200 feet in width thus granted vested in the company."
*Id.* at 116.  And in *New Mexico v. U.S. Trust Co.*, 172 U.S.
171 (1898), it held that the interest was more than a right of
passage: "[I]f it may not be insisted that the fee was granted,
surely more than an ordinary easement was granted,—one
having the attributes of the fee, perpetuity and exclusive use
and possession; also the remedies of the fee, and, like it,
corporeal, not incorporeal, property."  *Id.* at 183.

In *Northern Pacific Railway v. Townsend*, 190 U.S. 267
(1903), the owner of land adjacent to a right of way granted
by one of the pre-1871 Acts claimed adverse possession of a
portion of the right of way under Minnesota law.  Relying on
*Baldwin* and *U.S. Trust Co.*, the Supreme Court held that "the
fee passed by the grant," but further that the grant was
conditional:

> The substantial consideration inducing the
> grant was the perpetual use of the land for the
> legitimate purposes of the railroad, just as
> though the land had been conveyed in terms to
> have and to hold the same so long as it was
> used for the railroad right of way.  In effect
> the grant was of a limited fee, made on an
> implied condition of reverter in the event that
> the company ceased to use or retain the land
> for the purpose for which it was granted.

190 U.S. at 271.  That condition necessarily negated the
railroad's ability to alienate the right of way, either
voluntarily or by adverse possession.  *See id.* ("[T]o give such
efficacy to a statute of limitations of a state as would operate
to confer a permanent right of possession to any portion
thereof upon an individual for his private use, would be to

allow that to be done by indirection which could not be done
directly. . . . ").

By contrast, the Supreme Court held in *Great Northern*
that the 1875 Act "clearly grants only an easement, and not a
fee." 315 U.S. at 271.  In so holding, the Court distinguished
the 1875 Act from the pre-1871 Acts as "a product of the
sharp change in Congressional policy with respect to railroad
grants after 1871."  *Id.* at 275.  It therefore distinguished
*Roberts*, *Townsend*, and other cases decided under the pre-
1871 Acts without calling their holdings into question.
Indeed, the Court apparently endorsed the conclusion that the
pre-1871 grants were of a limited fee: "When Congress made
outright grants to a railroad of alternate sections of public
lands along the right of way, there is little reason to suppose
that it intended to give only an easement in the right of way
granted in the same act."  *Id.* at 278.

But the Court muddied the waters somewhat fifteen years
later.  The issue in *United States v. Union Pacific Railroad*,
353 U.S. 112 (1957), was whether the 1862 Act granted the
railroad the right to extract oil and mineral resources under its
right of way.  Whereas the Court in *Great Northern* had
drawn a parallel between the grant of the right of way itself
and the grant of the adjacent land, the Court in *Union Pacific*
drew a distinction: "On the face of the Act it would seem that
the use of the words 'the right of way' describes a lesser
interest than the grant of 'public land.'" 353 U.S. at 114.  In
addition, it held that the reservation of mineral lands applied
to the rights of way as well as the checkerboard grants.  *See
id.*  ("While the grant of 'the right of way' is made by § 2 and
the exception of 'mineral lands' is contained in § 3, the
exception extends not merely to § 3 but to the entire Act.").

The Court in *Union Pacific* acknowledged *Townsend* and like cases, but distinguished them:

> Some reliance is placed on a line of decisions of the Court which describe the rights of way under early railroad land grants as limited fees. These cases were, for the most part, controversies between the railroad and third persons and involved problems so remote from the present one as to be inapt as citations. . . . We do not stop to examine the other cases using like language to describe the railroad's right of way, because in none of them was there a contest between the United States and the railroad-grantee over any mineral rights underlying the right of way. The most that the "limited fee" cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes.

*Id.* at 118–19 (footnote omitted). Referring to the statutory language that granted the right of way "for the construction of [a] railroad and telegraph line," 1862 Act, § 2, it held that, "whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is not a railroad purpose within the meaning of § 2 of the Act." 353 U.S. at 114.

In the late 1970s and early 1980s, two circuits invoked *Union Pacific* to determine the railroad's interest in the land under its right of way. The Tenth Circuit held in *Energy Transportation Systems, Inc. v. Union Pacific Railroad*, 606 F.2d 934 (10th Cir. 1979), that the 1862 Act "did not

WELLS V. UNION PAC. R.R. CO.          13

convey title to the servient estate underlying the right-of-way." *Id.* at 937.  The Eighth Circuit reached the same conclusion the following year.  *See Energy Trans. Sys., Inc. v. Union Pac. R.R.*, 619 F.2d 696, 698 (8th Cir. 1980) ("[W]e affirm the district court's determination that Union Pacific's interest in [land subject to a right of way conveyed by the 1862 Act] is limited to surface and other rights used in the construction and operation of the railroad.").[3]

Some thirty-five years later, the Supreme Court returned to both the pre-1871 Acts and the 1875 Act in *Marvin M. Brandt Revocable Trust v. United States*, 134 S. Ct. 1257 (2014).  At issue was the status of rights of way granted under the 1875 Act if the grantee ceased to use them for a railroad. *Townsend* had decided that issue with respect to the pre-1871 Acts, *see* 190 U.S. at 271 ("In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted."), and the federal government argued that "the similarity in the language of the 1875 Act and the pre-1871 statutes shows that Congress intended to reserve a reversionary interest in the lands granted under the 1875 Act, just as it did in the pre-1871 statutes." 134 S. Ct. at 1266.  The Court rejected the argument:

> [T]hat is directly contrary to the very premise of this Court's decision (and the Government's argument) in *Great Northern*: that the 1875 Act granted a fundamentally different interest in the rights of way than did the predecessor statutes.  Contrary to the

---

[3] In keeping with the parties' practice, we refer to these cases collectively as the *ETSI Cases*.

> Government's position now—but consistent
> with the Government's position in
> 1942—*Great Northern* stands for the
> proposition that the pre-1871 statutes (and this
> Court's decisions construing them) have little
> relevance to the question of what interest the
> 1875 Act conveyed to railroads.

*Id.* (citations omitted).

## C.  Litigation History

Union Pacific currently operates trains on more than
32,000 miles of track, including tracks it acquired from the
Southern Pacific Railroad.  The vast majority of Union
Pacific's track is built on rights of way acquired under both
the pre-1871 Acts and the 1875 Act.

### 1.  *Union Pacific v. SFPP*

In the 1950s, Southern Pacific leased the land under some
of its rights of way to a sister company, which then built
1,800 miles of pipeline to transport petroleum products.
Originally affiliates, the railroad and the pipeline company
came under separate ownership in the 1980s, with Union
Pacific eventually succeeding to Southern Pacific's tracks and
other railroad assets, and SFPP, a subsidiary of Kinder
Morgan, acquiring the pipeline.

Union Pacific and SFPP entered into a series of
agreements under which Union Pacific granted a perpetual
easement to SFPP in exchange for fair market rent.  In the
event the parties could not agree on the fair market rent, the

agreements contemplated a judicial proceeding in California state court.

In a proceeding to determine fair market rent for 2004 through 2014, SFPP argued that the fair market rent for the easement should be reduced because of questions about Union Pacific's title to the rights of way.  It did not, however, question Union Pacific's right to grant the easement.  In 2012, the state trial court held that Union Pacific had a sufficient property interest in the land beneath its rights of way to entitle it to collect rent for the pipeline.

The California Court of Appeal raised sua sponte at oral argument the issue of "whether the Railroad had the right to grant the Pipeline's easements in the first instance, given the terms of the Congressional Acts and the extensive relevant case law." *Union Pac. R.R. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134, 155 (2014).   After soliciting supplemental briefing, it held that the grants under both the pre-1871 and the 1875 Acts did not give Union Pacific the right to lease the land under its rights of way to third parties. *See id.* at 177–78.  With respect to the 1875 Act, it relied on *Great Northern* and *Brandt* to conclude that the railroad acquired only an easement in the surface of the right of way, albeit one that conferred more than a right of passage, and in the subsurface only "to support the construction or operation of the railroad (i.e., for railroad purposes)." *Id.* at 163.  With respect to the pre-1871 Acts, it acknowledged *Townsend*'s "limited fee" language, but relied more heavily on *Union Pacific*'s "landmark" language that "[t]he most that the 'limited fee' cases decided was that the railroads received all *surface* rights to the right of way and all rights incident to a use for *railroad purposes*." *Id*. at 165–66 (quoting 353 U.S. at 119).  The state appellate court concluded by holding that

the pipeline did not serve a "railroad purpose," even if Union
Pacific used some of the pipeline's contents to fuel its own
trains.  *See id.* at 167 ("[T]he mere fact that a railroad leases
the subsurface to a third party to transport material that the
railroad may ultimately use does not, by itself, make the lease
a 'railroad purpose.'").

2.   District Court Proceedings

Spurred by the California Court of Appeal's decision,
owners of property that was formerly public land adjacent to
the rights of way filed class actions seeking damages for
trespass and under similar theories.  Cases were filed in
Nevada, Arizona, New Mexico and the Central District of
California.

In this case, Union Pacific asserted counterclaims for
declaratory relief and to quiet title.  The district court granted
the plaintiffs' motion to dismiss those counterclaims,
following what it called the "persuasive reasoning" of the
state court's "lengthy, well-researched, and thoughtful
opinion."  *In re SFPP Right-of-Way Claims*, No. SACV 15-
00718 JVS (DFMx), 2016 WL 3456985, at *2, *4 (C.D. Cal.
June 7, 2016).  Accordingly, it held that the pre-1871 Acts
required a "railroad purpose" under *Union Pacific*, that the
1875 Act required a "railroad purpose" under *Great
Northern*, and that the pipeline lease did not serve such a
purpose under either act.  *See id.* at *6–8.  The district court
therefore dismissed the counterclaims "to the extent that
those counterclaims rely on the 19th century Congressional

acts." *Id.* at *8.[4]  However, it certified the following two
questions of law pursuant to 28 U.S.C. § 1292(b):

> 1. Can Union Pacific authorize a use of the
>    subsurface underneath the railroad right of
>    way if the use does not serve a "railroad
>    purpose"?
>
> 2. Can Union Pacific demonstrate a "railroad
>    purpose" in granting a subsurface
>    easement to a third party to operate a
>    commercial petroleum pipeline through
>    the subsurface of the rights of way?

Union Pacific timely petitioned for interlocutory review,
which we granted.

II

A.  Collateral Estoppel

We first address the appellees' contention that we should
not reach the merits of the certified questions, but should
instead give preclusive effect to the California Court of
Appeal's decision under the doctrine of collateral estoppel.[5]

---

[4] A small portion of Union Pacific's rights of way were acquired by
private conveyance.  *See In re SFPP Right-of-Way Claims*, 2016 WL
3456985, at *8.

[5] The appellees further argue that Union Pacific has waived its
arguments on the merits because it did not present them to the district
court.  While the record reflects that both sides argued extensively about
collateral estoppel, Union Pacific also challenged the merits of the state-
court decision, calling it "wrong on the law" and in direct conflict with

Our jurisdiction under 28 U.S.C. § 1292(b) is limited to the certified order.  *See United States v. Stanley*, 483 U.S. 669, 677 (1987).  "Although we have authority to review issues fairly included within the certified order, review of issues not included in the certified order would obliterate the distinction between interlocutory appeals and appeals after final judgment and would encourage circumvention of the conventional appeals process."  *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 744 F.3d 1124, 1134 (9th Cir. 2014).

The appellees' motion to dismiss argued that the district court should follow the California Court of Appeal's decision both because it was binding on Union Pacific and because it was correct on the merits.  The certified order, however, expressly decided the motion "without regard to collateral estoppel," citing the state-court decision "for its persuasive value rather than its preclusive effect."  Although the district court stated that it would address collateral estoppel "[i]n a subsequent order," it has not done so.  In these circumstances, we think the "letter and spirit of § 1292(b)," *Deutsche Bank*, 744 F.3d at 1134, strongly counsel that we confine ourselves to the two legal issues decided and certified by the district court.  *See SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 113 (2d Cir. 1998).[6]

---

"longstanding Supreme Court precedent" in its written submissions.  It also stated at oral argument that *Union Pacific* was distinguishable because "[m]ineral rights are different than subsurface rights."  The basis of the district court's decision confirms that it understood Union Pacific to be arguing the merits.

[6] We express no opinion as to whether, on remand, the district court should return to the issue of collateral estoppel or how it should decide it.  We would, of course, have jurisdiction to review its ruling in an appeal at the conclusion of the case.

B.  Do the Acts Require a Railroad Purpose?

The phrase "railroad purpose" does not appear in either the pre-1871 Acts or the 1875 Act.  Rather, it comes from the Supreme Court's description in *Union Pacific* of the nature of the rights acquired under the statutes.  With respect to the pre-1871 Acts, the Court held that "whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is not a railroad purpose within the meaning of § 2 of the [1862] Act."  353 U.S. at 114.  With respect to the 1875 Act, it described the interest recognized in *Great Northern* as "only an easement for railroad purposes."  *Id.* at 119.

Nevertheless, the first question certified by the district court asks, in essence, whether both the pre-1871 Acts and 1875 Act require a railroad purpose.  That is a question of statutory interpretation and, therefore, our review is de novo. *See Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 715 (9th Cir. 2013).

1.  Pre-1871 Acts

With respect to the pre-1871 Acts, the parties' competing interpretations stem from the Supreme Court's differing descriptions of the rights conveyed by the acts.  *Townsend* squarely described the interest conveyed as a fee simple determinable, or in more modern parlance, a fee simple defeasible:

> The estate in fee simple defeasible is a present interest that terminates upon the happening of a stated event that might or might not occur. The subcategories historically known as the

> fee simple determinable, the fee simple
> subject to a condition subsequent, and the fee
> simple subject to an executory limitation are
> no longer recognized but are absorbed under
> the term fee simple defeasible.

Restatement (Third) of Prop.: Wills & Other Donative
Transfers § 24.3 (Am. Law Inst. 2011).  In describing the
grant "as though the land had been conveyed in terms to have
and to hold the same so long as it was used for the railroad
right of way," *Townsend*, 190 U.S. at 271, the Court used the
classic language of limitation.  *See* Restatement (Third) of
Prop.: Wills & Other Donative Transfers § 24.3 cmt. e (Am.
Law Inst. 2011) ("The language that characterized the fee
simple determinable . . . was called 'language of limitation'—
language such as 'during,' 'until,' 'while,' 'so long as,' or
'for so long as.'").  Its description of the government's
"implied condition of reverter," 190 U.S. at 271, was also a
clear reference to the fee simple determinable.  *See*
Restatement (Third) of Prop.: Wills & Other Donative
Transfers § 24.3 cmt. b (Am. Law Inst. 2011) ("A fee
simple determinable could be followed by either a reversionary or a
nonreversionary future interest.  If the following future
interest was a reversionary future interest, it was called a
'possibility of reverter.'").

    As the owner of the fee, the railroad could do anything an
owner in fee simple absolute could do, as long it was not
inconsistent with the language of limitation.  *See* Restatement
(First) of Prop. § 49 (Am. Law Inst. 1936) ("The privilege of
the owner of a possessory estate in fee simple defeasible to
use the land is identical with that of an owner of a possessory
estate in fee simple absolute, except that the privilege is
limited by a duty not to commit waste.").  For example, as the

Court held in *Townsend*, alienation would be inconsistent with the limitation.

The "limited fee" described in *Townsend* does not restrict use of the right of way to railroad purposes and would, therefore, resolve the first certified issue in favor of Union Pacific, at least with respect to the pre-1871 Acts. The California Court of Appeal and the district court, however, both relied on the later statement in *Union Pacific* that "[t]he most that the 'limited fee' cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes." 353 U.S. at 119. While *Union Pacific*'s narrowing of *Townsend* and the other "limited fee" cases is binding and those cases therefore do not control the outcome here, neither does *Union Pacific* lead to the opposite result.

The Court in *Union Pacific* laid great emphasis on the nature of the claimed right: extraction of oil from the subsurface mineral estate under the right of way. Accordingly, it was not inappropriate for the Court to invoke the proviso in section 3 of the 1862 Act expressly excluding "mineral lands" from the grant. We disagree with the district court (and the California Court of Appeal) that "the railroad's lease of the portions of the subsurface of the servient estate is a use essentially no different than the use of extracting oil and gas." *In re SFPP Right-of-Way Claims*, 2016 WL 3456985, at *5. While oil and mineral resources may be located beneath the surface, it is not correct to say that the "subsurface" and "mineral lands" are synonymous. Rather, the legally relevant distinction is between the "surface estate" and the "mineral estate," not the "surface" and the "subsurface":

> A grant or reservation of minerals effects a horizontal severance of the rights in the land and creates two separate estates—one in the minerals and one in the surface. ("Surface" is defined as the entire estate, *including the subterranean estate*, other than the severed minerals.)

9 Richard R. Powell et al., *Powell on Real Property* § 63.06[2] (Michael Allan Wolf ed., 2017) (emphasis added).

By its terms, section 3's proviso prevents the grantee from extracting mineral resources, not from using the subsurface for any other purpose. This is in keeping with the common law's distinction between an ordinary easement ("a nonpossessory right to enter and use land") and a profit à prendre ("an easement that confers the right to enter and remove timber, minerals, oil, gas, game, or other substances"). *See* Restatement (Third) of Prop.: Servitudes § 1.2 (Am. Law Inst. 2000). Thus, *Union Pacific*'s observation that the railroads "received all surface rights to the right of way" under the 1862 Act, 353 U.S. at 119, should not be understood to mean that the railroads received no rights in the subsurface.

We acknowledge that the Eighth and Tenth Circuits did not make the same distinction in the *ETSI Cases*. Both courts took *Union Pacific*'s reference to "surface rights" to refer to the physical surface of the land, to the exclusion of any rights in the subsurface. In our view, however, that reading was subsequently undermined by *Brandt*, which reaffirmed the longstanding consensus that the 1875 Act reflected a major shift in policy from the pre-1871 Acts. *See* 134 S. Ct. at 1264 ("The Court accepted the Government's position that prior

cases describing the nature of pre-1871 rights of way . . .
were 'not controlling,' because of the shift in congressional
policy after that year." (citing *Great N. Ry.*, 315 U.S. at
277–78 & n.18)).  If *Union Pacific* means what the California
Court of Appeal and the district court took it to mean, then
the interest conferred by the pre-1871 Acts is essentially the
same as that conferred by the 1875 Act (as explained below).

For these reasons, we hold that, while *Union Pacific*
modified *Townsend*'s holding to stand only for the
proposition that the railroads obtained *at least* the rights
necessary to carry out railroad purposes under the pre-1871
Acts, it did not go further and hold that "railroad purposes"
actually defined the outer limits of the grants.  In other words,
*Union Pacific* instructs us that *Townsend* does not control the
result in this case, but does not itself tell us whether the pre-
1871 Acts require a railroad purpose.

Instead, we find the answer in *Brandt*, which reaffirmed
that the 1875 Act conveyed an interest different from that
conveyed by the pre-1871 Acts.  Because the landowners'
position would eliminate that difference, we hold that the pre-
1871 Acts conferred a fee simple defeasible in everything
except the mineral estate.  That interest entitles Union Pacific
to lease the subsurface as well as the surface of its right of
way to SFPP as long as it continues to use the right of way to
operate a railroad, regardless of whether the pipeline itself
serves a "railroad purpose."

2.  1875 Act

Our answer to the first certified question does not make
the second moot because Union Pacific concedes that the
1875 Act conferred only an easement in the right of way,

albeit a broad easement "for railroad purposes." *Union Pac.*,
353 U.S. at 119 (citing *Great N. Ry.*, 315 U.S. at 278).  Thus,
even though we have concluded that the pre-1871 Acts do not
require a railroad purpose, we must still decide whether the
pipeline served such a purpose for those rights of way
acquired under the 1875 Act.[7]

C.  Can the pipeline serve a railroad purpose?

Union Pacific did not reference the pipeline's ostensible
railroad purpose in its original counterclaims.  It did,
however, seek leave to amend to add facts supporting the
contention that it served such a purpose.  The district court
denied leave to amend as futile.

The district court's conclusion that Union Pacific failed
to allege a necessary element of its counterclaims is reviewed
de novo.  *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058,
1061 (9th Cir. 2004).  Its decision to deny leave to amend is
reviewed for abuse of discretion, *see Cervantes v.
Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th
Cir. 2011), but leave to amend should be denied as futile
"only if no set of facts can be proved under the amendment to
the pleadings that would constitute a valid and sufficient
claim or defense," *Sweaney v. Ada County*, 119 F.3d 1385,
1393 (9th Cir. 1997) (quoting *Miller v. Rykoff-Sexton, Inc.*,
845 F.2d 209, 214 (9th Cir. 1988)).

Union Pacific's proposed amendment alleges that the
pipeline serves a railroad purpose "because Union Pacific

---

[7] Although Union Pacific acquired rights of way under both the pre-
1871 Acts and the 1875 Act, it does not provide any detail as to the
proportion acquired under each act.

uses capacity on the pipeline to transport millions of gallons
of fuel a year, purchased directly by Union Pacific from third-
party refineries, via dedicated facilities to private terminals on
the railroad line that Union Pacific owns." It alleges that it
"uses this fuel to power its locomotives," and that the use of
fuel from the pipeline "reduce[s] core railroad operating costs
by millions of dollars a year." We hold that the district court
should have granted leave to amend because that allegation,
if proven, is sufficient to establish a prima facie case that the
pipeline serves a railroad purpose.

It is beyond dispute that a railroad right of way confers
more than a right to simply run trains over the land. *See New
Mexico v. U.S. Trust Co.*, 172 U.S. at 183. As a result, courts
have approved a variety of uses incidental to railroad
operations. *See Illig v. United States*, 58 Fed. Cl. 619, 634
(2003) (power lines); *Mellon v. S. Pac. Transp. Co.*, 750 F.
Supp. 226, 231 (W.D. Tex. 1990) (communication lines);
*McSweyn v. Inter-Urban Ry.*, 130 N.W.2d 445, 448 (Iowa
1964) (fuel storage); *Miss. Invs., Inc. v. New Orleans & N.E.
R.R.*, 188 F.2d 245, 247 (5th Cir. 1951) (freight warehouses
"and other like structures"); *Mitchell v. Ill. Cent. R.R.*,
51 N.E.2d 271, 275 (Ill. 1943) (gas station and storage tanks).
The Supreme Court has embraced this so-called "incidental
use doctrine," although not specifically in connection with the
pre-1871 Acts or the 1875 Act:

> [W]hile it must be admit[t]ed that a railroad
> company has the exclusive control of all the
> land within the lines of its roadway, and is not
> at liberty to alienate any part of it so as to
> interfere with the full exercise of the
> franchises granted, we are not prepared to
> assert that it may not license the erection of

> buildings for its convenience, even though they may be also for the convenience of others.  It is not doubted that the [railroad] might have erected similar structures on the ground on which the plaintiffs' buildings were placed, if in its judgment the structures were convenient for the receipt and delivery of freight on its road.  Such erections would not have been inconsistent with the purposes for which its charter was granted.  And, if the company might have put up the buildings, why might it not license others to do the same thing for the same object; namely, the increase of its facilities for the receipt and delivery of freight?  The public is not injured, and it has no right to complain, so long as a free and safe passage is left for the carriage of freight and passengers.

*Grand Trunk R.R. v. Richardson*, 91 U.S. 454, 468–69 (1875) (construing rights of railroad chartered under Vermont statute).  Even *Union Pacific* recognized that the 1862 Act conferred "all rights *incident to* a use for railroad purposes." 353 U.S. at 119 (emphasis added).

The district court reasoned that several factors took the pipeline outside the ambit of the incidental-use doctrine. First, it again drew a distinction between the railroad's rights to the surface and its rights to the subsurface.  As we explained, the relevant distinction is not between the "subsurface" and the "surface," but between the "mineral estate" and the "surface estate," which includes all of the subsurface except mineral estate.  In both *Union Pacific* and *Great Northern*, the issue was whether the railroad had the

right to extract resources from the mineral estate.  *See Union Pac.*, 353 U.S. at 114; *Great Northern*, 315 U.S. at 270.  The Supreme Court's negative answer does not foreclose any other use of the subsurface from being a railroad purpose.

We are similarly unpersuaded by the district court's conclusion that the incidental-use doctrine does not apply because the pipeline is operated by a third-party and for private gain.  *Grand Trunk* makes it clear that a railroad may license third parties to do what it could do itself, even if the third party benefits in addition to the railroad.  *See* 91 U.S. at 468 ("[W]e are not prepared to assert that [the railroad] may not license the erection of buildings for its convenience, even though they may be also for the convenience of others.").

More fundamentally, *Grand Trunk* makes the sensible point that a railroad appurtenance has the same impact on the servient estate whether it is built by the railroad or a third party.  *Accord Mitchell*, 51 N.E.2d at 274 ("No compelling reason is advanced by plaintiff, or in the authorities cited by him, satisfactorily explaining why, if a bulk, or wholesale, station is allowed to be operated on a railroad right of way, the owner of the bulk station, in addition to selling wholesale, cannot likewise properly include facilities for selling at retail.").  The appellees concede that a pipeline built by Union Pacific exclusively to transport fuel to its trains would serve a railroad purpose.  As far as the record and pleadings currently before us reveal, such a pipeline would look and function exactly like the actual pipeline, and would have exactly the same impact on the appellees' land.

We acknowledge that an appurtenance might be of such minimal or illusory benefit to railroad operations as to make the incidental-use doctrine inapplicable.  For present

purposes, it is sufficient to say that Union Pacific has plausibly alleged that the benefit it derives from the pipeline is sufficient for the doctrine to apply.

### III

With respect to the first certified question, we hold that the pre-1871 Acts do not require a "railroad purpose." With respect to the second, we hold that Union Pacific has plausibly alleged that the pipeline serves such a purpose. We therefore reverse the district court's order granting the motion to dismiss Union Pacific's counterclaims and remand with instructions to grant leave to amend.

**REVERSED and REMANDED.**